No. 113.—NANCY GOODWYN, plaintiff in error, *vs.* NAPOLEON B. GOODWYN, defendant in error.

[1.] It is not competent to impeach, by witnesses, the memory of a witness in order to disparage his testimony. It must be done by cross-examination.

[2.] Where a witness is rejected through the misapprehension of the Court, as to his testimony, it is the duty of the Court to allow the witness to be examined whenever the mistake is discovered.

[3.] Family statements are not admissible, unless the individual member is present whose interest is to be affected.

[4.] Witnesses cannot state their belief, unless accompanied with the facts upon which it is founded.

[5.] Possession of personal property by the vendor after an absolute conveyance, is a badge of fraud; it is susceptible, however, of explanation.

[6.] The fact that the father holds for an infant child, is not explanatory of the father's possession which had commenced before the title of the minor accrued.

[7.] If A sells property to B to defraud C, while the contract is void as to C, it is nevertheless good as between A and B. If B paid for the property, he can sue for and recover it out of A. Not so, however, if no consideration or price was paid.

[8.] If the contract was executed by delivery, the Courts will not rescind although fraudulent. On the other hand, they will not interfere to inforce a contract which is both fraudulent and without consideration.

[9.] The doctrine of estoppel does not obtain unless there be injury to one party or advantage to the other, resulting from the acts or declarations of the person to be estopped.

[10.] The Court has a right to charge, and the Jury to find, upon *secondary* evidence, provided the same has been introduced without objection.

Trover, in Coweta Superior Court. Tried before Judge BULL, March Term, 1856.

This was an action of trover brought by Napoleon B. Goodwyn against Nancy Goodwyn for some nine negroes.

The defendant pleaded the general issue and the Statute of Limitations.

The following is the evidence in the case:

Napoleon B. Goodwyn offered in evidence the following

testimony, viz: The copy will of Elizabeth Goodwyn, his grand-mother, by which the said Elizabeth bequeathed to him Winney and her children, subject to a trust deed on the children. Under and by virtue of said will, plaintiff claims title to the property in dispute in said action of trover, which bears date on the 1st day of October, 1830.

Plaintiff then introduced JOHN R. CROSS, who testified that he knew the negro woman, Winney, from 1842 to 1845 or 1846; that she was in the possession of defendant when she moved from Virginia in 1843, and had, at the time of removal, in 1843, Harriet, Caroline, Julia and Ned; that plaintiff, defendant and negroes all moved from Virginia; heard the defendant say, in Virginia, on the road and in Georgia, that the negroes were plaintiff's; heard plaintiff claim them frequently in defendant's presence, and defendant said they were his. Some one offered to buy one of the negroes in North Carolina, when they were removing to Georgia; plaintiff said he would not sell them—that no money could buy them. This was said loud enough for defendant to hear it; heard the defendant say in 1843 or 1844, that the property was plaintiff's; that he then proved the value of the negroes and their average value for hire.

JOSEPH B. CAMP's interrogatories: I did assign the annexed instrument as a witness, and saw a copy of the same served upon defendant by said plaintiff, on the evening of the 13th day of August, 1849, at defendant's own house, in Coweta County, Ga. and defendant refused to give them up, saying they were not plaintiff's negroes. I was present when a verbal demand was made by plaintiff of defendant for certain negroes, to-wit: Winney, a black woman about 36 years old; Caroline, a yellow woman, the child of Wynney, about 22 years old; Martha, a yellow child about two years old, the child of Caroline; Harriet, a yellow woman about 18 years old, the child of Winney; Joe, a yellow child about a year and a half old, the child of Harriet; Ned, a black negro boy, the child of Winney, about 13 years old; Julia, a

black girl about ten years old, a child of Winney; Anthony, a black boy about three years old, a child of Winney.

Plaintiff demanded the aforesaid negroes of defendant at her own house, in Coweta County, Ga. and she refused to give them up. Plaintiff charged defendant with having told him often before that they were his negroes, saying to her at the same time, ma, do not you know that you told me so? To which defendant said nothing, placing, at the same time, her hands on her face, as if at great loss to know what to say, when Thomas and Braddock Goodwyn spoke simultaneously, in a loud and angry voice, saying, and repeating often, " No, she never—they are not your negroes—you shall never have them," &c. This produced quite an excitement, and I thought the parties would come to blows, but they did not. Knows nothing more that will benefit the plaintiff.

To the cross-interrogatories knows nothing.

WILLIAM BEADLES was then sworn, who testified that he · knew Winney and Caroline. Caroline was Winney's child, . about 14 or 15 years old when she came to Georgia; knew Harriet; she was Winney's child; was 12 or 13 years old when she came to Georgia. After Christmas, in the latter part of the Hollidays in '46 or the first part of '47, I was at defendant's house and was complimenting her on the marriage of her children, and said to her, I suppose a certain lady has given Napoleon his walking papers? When defendant said, they need not do it, nor any other lady, for Napoleon was worth as much property as her father was able to give her; that Napoleon had some four or five negroes, and went on to mention Winney, Harriet and Caroline, and said that his grand-mother had willed them to him in Virginia. He further said, that he recollected the time, and that he remembered it without having to inquire of any person, and that he did not inquire of any one to fix the time.

He, on cross-questions, answered that he could not recollect the time when Van Buren was elected President; when the court-house in Newnan was built; when he was subpœnaed in the case; and he answered, in 1846.

WILLIAM BAILEY : Know all the negroes but Ned ; proved their value and their hire per annum.

THOMAS G. KING : Had a conversation in the fall of '45, in October, with Mrs. Goodwyn ; was there building a screw ; Mrs. Simms, daughter of defendant, was sick ; he asked defendant why she did not send one of the yellow girls to wait on her ? She replied that they were Napoleon's, who was up the country and would be back after them the next fall. He is the more certain of the time because of some Justice's Court papers which he has since found. Built a screw for Simms ; went from Simms' to defendant's to put up a screw.

JAMES A. GRAHAM testified, that King built a screw for Beadles in '45, in the fall ; thinks he went from there to Simms', and from there to defendant's ; not certain.

JACK C. LUMPKIN saw Ned in possession of Napoleon about his grocery, in Newnan, in 1848.

Testimony of ELIZABETH H. EDMONDSON, taken by commission : She knows the parties ; that she was acquainted with the slaves, Winney and Caroline, and a girl by the name of Harriet, which she understood was the child of Winney ; and she does not recollect to have seen any other children of the said Winney and Harriet. She says that she heard Mrs. Nancy Goodwyn say that there were five negroes left to Napoleon B. Goodwyn by his grand-mother ; these five negroes were Winney and her children ; she is not positive, but thinks it was five negroes stated at the time by Mrs. Goodwyn as being the number, including Winney and her children ; she stated that it was about the first of September, in the year 1843, at the house of Mrs. Nancy Goodwyn, in the County of Coweta, where this conversation was had ; she states that the said negroes were then at the house of Mrs. Nancy Goodwyn, and she presumed they were in her possession at that time ; that she had heard Mrs. Nancy Goodwyn say, several times previous to the first of September, 1843, that said negroes, Winney and her children, were Napoleon B. Goodwyn's negroes. She states she knows Caroline and Harriet ; that they are mulatto girls—Caroline rather tall,

and Harriet is of a medium size; that she had seen Winney; that she is of a dark complexion; that she does not recollect her size. The other children she knows nothing of; that the conversation was had with Mrs. Goodwyn in the month of Sept. 1843, at one time, and that she had heard her make about the same statement several other times previous to the 1st September, 1843, at the house of the defendant; that no person was present besides witness at the time and place of conversation; that Napoleon B. Goodwyn had said that he would give all that he was worth, or ever expected to be worth, for a certain gentleman to leave his wife; and then stated to witness the conversation before referred to.

Testimony of WILLIAM MITCHELL, taken by commission: He says he knows the parties; that he resided on defendant's plantation and overseed; I know the slaves mentioned in interrogatories, which were born in Virginia; I have never heard defendant say any thing in reference to the ownership of said slaves; I heard her say, in 1840, when plaintiff proposed to hire out one of the slaves, that she could give as much for her as Mr. Foster, who proposed to hire her. The slaves were in the possession of the defendant; the plaintiff lived with defendant until they moved to Georgia; plaintiff lived with his father until his death; he died in the County of Brunswick, the place from whence his widow moved to Georgia; don't know where plaintiff's grand-mother, Elizabeth Goodwyn, died, or who died first; that he had loaned defendant money.

Plaintiff then introduced the testimony of JOHN D. PERKINS, taken by commission, which was as follows: I know six of the negroes; I knew them last in possession of the defendant in the State of Georgia; I never heard defendant say any thing about the ownership of these negroes; I resided with defendant while in Georgia as a visitor; I left 15th November, 1845; I know nothing about the way in which the negroes came in possession of the defendant; plaintiff lived with his father until his death, and then resided with the defendant until she moved to Georgia; the plaintiff lived

with defendant about ten or eleven months after she moved to Georgia; I returned to Virginia on defendant's business.

Interrogatories of WM. H. GOODWYN and STEPHEN P. POOL. Wm. H. Goodwyn : Knew Winney as the slave of Burwell Goodwyn; I know she had children; I do not recollect their number or sex; I recollect nothing about the sale of said slaves. I, Stephen P. Pool, know Winney and three of her children, Caroline and Harriet; Winney had other children, but do not recollect their number or their names. Winney and the children were sold by the Sheriff at public sale, on the plantation belonging to Burwell Goodwyn, in Brunswick County, Virginia, during or about the year 1829—I think it was during 1829. He answers, that Mrs. Elizabeth Goodwyn purchased Winney and her children at said Sheriff's sale; I know said Sheriff paid the debt, to satisfy which these slaves were sold. Both say, we are acquainted with all the parties; knew William H. Goodwyn, her son, and thinks he has read, or heard read, the original will alluded to, but it has been so long ago that I do not recollect the contents of said will ; I saw the original will executed and signed as a witness ; the original will was written by Joseph or Burwell Goodwyn, I do not recollect which, not being present when it was written. They both say they do not know where Napaleon B. Goodwyn lived during the whole time prior to the removal of his mother to Georgia ; they think he resided a part of his time with his mother—probably a greater part of his time with his mother ; he thinks he was residing with his father at the time the will was executed—and, in fact, up to the time of his father's death. They do not know the plaintiff's age at the time referred to ; Stephen P. Pool knew he was living with his father at the time of the sale of the slaves referred to ; we never heard Burwell Goodwyn or Nancy Goodwyn say any thing about the ownership of the slaves; they know that the late Col. Joseph Goodwyn died in June of the year 1838; he acted as executor to the will referred to. We believed the slaves were all the time in the possession of Burwell Goodwyn and his widow, up to

the time of her removal to Georgia. We do not know whether or not it was with the assent of Col. Goodwyn that the slaves remained in the possession of Burwell Goodwyn to the time referred to, nor do we know any thing about his consenting to any legacy.

The cross-interrogatories to the witnesses were then withdrawn by the defendant, and the answers made by the plaintiff, as follows:

We fully believe that the negroes alluded to did formerly belong to Burwell Goodwyn, and we judge, from all the circumstances, that they are the same now sued for in Georgia; we believe the negroes alluded to were always in the possession of Burwell Goodwyn and his widow to the time of their removal to Georgia from Virgina. To which testimony the defendant excepted, on the ground that it was mere matter of opinion. The Court over-ruled the objection; and for this reason defendant, by her Counsel, objected, and now objects to said ruling as error.

STEPHEN P. POOL said he knew nothing that went to prove it a sham sale; was present at the sale, and knows it was not a sham sale; when the slaves were sold by the Sheriff to pay debts for which he was bound as security for Burwell Goodwyn; it has been so long since the sale that I can't now recollect whether I saw any money paid by the purchaser or not. Pool answers, I never heard Burwell Goodwyn, or the defendant, or any of the parties, except Mrs. E. Goodwyn, in the matter specially mentioned, say anything about these slaves after the sale. Both say, as far as we know, possession was never interrupted by the executor; we do not recollect that we ever heard him say anything on the subject.

Plaintiff next introduced the testimony of ABRAM V. WELLS and EXAVIA FOSTER, which was as follows: Abram V. Wells answers, he knows all the parties, and was well acquainted with Burwell Goodwyn, the person referred to in said interrogatories; he knew the woman Winney referred to, and knew she had children, seen them often, but he did not know them by name; remembers having heard the said Burwell

Goodwyn and Nancy Goodwyn, since the death of her husband,. the said Burwell Goodwyn, and Braddock Goodwyn, all since the year 1830, say that the slaves referred to had been purchased by Mrs. Betsey Goodwyn,.and by her given to Napoleon B. Goodwin; he heard each of them boast how well Napoleon would be off. We heard Mrs. Nancy Goodwyn, since the death of her husband, say the said slaves belonged to Napoleon Goodwyn, but does not recollect the time when he last heard her say so, but is satisfied it was since the death of her husband; he thinks about the fall of 1829 or 1830, Winney and her children were sold at Sheriff's sale and purchased by the mother of Burwell Goodwyn; that the negroes were all along called Napolean's; that after the sale above mentioned, Burwell Goodwyn was considered insolvent; he knew that he was largely indebted, and if he had claimed the said property, his creditors would have seized it; that he did some business for the said Goodwyn, and knew such was the fact; that Napoleon had good credit upon the faith of those negroes in Virginia, while Braddock had no credit, not having property.

The cross-interrogatories were then introduced by defendant, and the answers of the said Wells to them read by plaintiff, as follows:

He knows that Winney was the name of the woman formerly owned by Burwell Goodwyn, and that she had children; that he never heard Burwell Goodwyn say that he held them under his mother's will for the use of his children; but that he heard Burwell Goodwyn say the said negroes belonged to Napoleon; that he cannot say when he last heard Burwell Goodwyn speak of it, but he heard him speak of it often since the said sale; that he never heard Mrs. Goodwyn say said negroes were paid for with her husband's money, or that they belonged to her children; but that she always said said negroes belonged to Napoleon; that he cannot recollect the last time he heard Mrs. Goodwyn speak of the matter; that she, Mrs. Goodwyn, was in the habit of visiting his house, and that he there heard her often speak of the said negroes.

EXAVIA FOSTER answers as follows : He knows the parties in said cause, and was intimate in the family, but that he did not know Burwell Goodwyn ; he died before he moved to Brunswick ; he knew the woman Winney and her children, Caroline and Harriet ; that she might have had other children ; that he did not recollect them ; that he never saw Burwell Goodwyn ; that he heard Mrs. Nancy Goodwyn frequently say since her husband's death, that the said Winney and her children belonged to Napoleon ; that they were purchased by his grand-mother ; he cannot say the exact time when he last heard her speak of the matter, but that he is satisfied that he heard her say as much a short time before she left Virginia ; that he did at one time make application to Napoleon Goodwyn to hire Caroline, but that he is not distinct in his recollection as to the conversation ; he thinks he first applied to Napoleon's mother, and when he consulted, her, she told him to see Napoleon, saying the negroes belonged to Napoleon ; the conversation took place at Mrs. Goodwyn's ; he could not recollect the precise time, nor could he say whether Napoleon was present when he spoke to his mother ; he was intimate in the family ; heard Mrs. G. repeatedly say that the negroes belonged to Napoleon, and that he heard Napoleon B. frequently say, in the presence of the family, the said negroes belonged to him, and he never heard any of the family deny it.

The defendant objected to so much of the answers of the witnesses as related to what he heard the family say, and as related to what he heard plaintiff say in the presence of the family, in regard to the ownership of said negroes, it not appearing that defendant acknowledged plaintiff's title, or heard any other member of the family do so at the time referred to by witness, or that the defendant was present and heard the plaintiff set up his claim to said negroes. The Court over-ruled the objection and admitted the testimony, and the defendant excepted to the decision. The defendant withdrew the answers to the cross-interrogatories propounded to this last named witness, and they were read by the plaintiff, as

Goodwyn *vs.* Goodwyn.

follows: Witness answered that he did not know that they were the same negroes, but that Winney, Caroline and Harriet were the names of the negroes in Mrs. Goodwyn's possession and claimed by Napoleon; he never saw Burwell Goodwyn; he never heard Mrs. Goodwyn say the negroes were purchased with her husband's money, but she always said the negroes belonged to Napoleon; that he could not say the last time he heard Mrs. Goodwyn speak of said negroes; that he heard her speak of them repeatedly at her own house and in the presence of all the family; that Mrs. Goodwyn visited his (witness') house very often, and that he has heard her there say the negroes belonged to Napoleon. The witness cannot recollect who was present when he spoke to Mrs. Goodwyn about the hiring of the girl Caroline, or whether any one; that the conversation occurred at Mrs. Goodwyn's house.

The plaintiff also introduced the testimony of WILLIAM H. GOODWYN, taken by commission, which was as follows: Witness has never examined the original will of Elizabeth Goodwyn, though he witnessed it; he is not acquainted with the hand-writing of Burwell Goodwyn; have seen him write; saw him write the last will of Elizabeth Goodwyn, to which he was a witness; has never heard Burwell Goodwyn make any allusion to the will of Elizabeth Goodwyn; knows the slave Winney alluded to; does not know who carried her to Georgia; does not know in whose possession they were in Virginia after the death of Burwell Goodwyn.

Answers to cross-interrogatories: Witness was present when Elizabeth Goodwyn made her will; was quite young at the time, and does not recollect the conversation that passed between Burwell and Elizabeth Goodwyn on that occasion, and did not know, at the time that Elizabeth Goodwyn made her will, anything of its contents; he does not know for what purpose or why Winney and her children were willed to Napoleon B. Goodwyn; has never heard, as well as his memory serves him, Elizabeth Goodwyn say anything in respect to

the matter; he knows nothing in relation to the deed of trust, or what has become of it; he does not know that said deed of trust was made for said Burwell and his children's benefit; he does not positively know that said negroes remained in possession of Burwell Goodwyn after said Sheriff's sale, but thinks they did; does not know how long said negroes were in possession of Burwell Goodwyn, if at all; is not positive, but thinks said slaves, Winney and her children, were in possession of said Burwell Goodwyn at the time Elizabeth Goodwyn made her will; does not know positively that said slaves remained in said Burwell's possession up to the time of his death, but suppose that they did; has never heard defendant claim said negroes; cannot answer anything of his own knowledge in reference to the possession of said negroes by Burwell or Nancy Goodwyn after the Sheriff's sale; has never heard Elizabeth Goodwyn say anything in reference to Winney and her children being given to said Napoleon for the purpose of shielding them from debts of said Burwell Goodwyn; recollected nothing of the deed of trust; never heard Elizabeth Goodwyn mention a deed of trust, or anything relating to it; never heard Elizabeth Goodwyn say she bought Winney and her children at Sheriff's sale and paid for them with said Burwell's money.

The plaintiff also introduced the testimony of STEPHEN P. POOL, taken by commission. Witness answers that he never did examine the original will of Elizabeth Goodwyn, deceased; is acquainted with the hand-writing of Burwell Goodwyn, deceased; has seen him write divers times; has seen writing that he acknowledged to be his; never heard Burwell Goodwyn say he wrote the will; knew the negroes, Winney and her children; they were bought by Elizabeth Goodwyn; does not know who carried them to Georgia; they were in the possession of Nancy Goodwyn after the death of Burwell Goodwyn; has never heard Burwell Goodwyn or his wife say anything in relation to the ownership of said slaves, Winney and Caroline.

Answers to cross-interrogatories: Witness was not present

Goodwyn vs. Goodwyn.

at the writing of the will, and knows nothing of any conversation that took place; does not know for what purpose they were willed to Napoleon; knows nothing of an agreement with the Sheriff to exempt them from said Burwell's debts; never did hear said Elizabeth say, or Burwell, in her presence, say, uncontradicted by her, that such an arrangement was made; knows nothing about the deed of trust, its place of deposit, or what has become of it, for whose benent, or that there even was one made; knew but little of Winney and her children after he had them sold at Sheriff's sale; never saw them but once afterwards.

The plaintiff then closed his testimony.

Defendant opened his defence to the Jury and introduced HENRY FRY, as witness, to prove that sometime during last fall, William Beadles had several hogs at Mark North's, with whom said Fry was living and attending to his (North's) farm; that he (Fry) notified said Beadles of the fact, and that said hogs were troublesome, and that he (Beadles) must get them away; Beadles told witness to put up the hogs in a pen, and then he would get them away, which said witness done; that Beadles failing to get the hogs away, witness again mentioned the matter to him sometime afterwards, and stated to Beadles that he would charge him for fattening his hogs; Beadles replied that he would not pay him after neglecting to tell or inform him about the matter; witness replied that he had told him several times about it, and Beadles mentioned that he had never heard a word about it before. This testimony was offered to show the character of the memory of Beadles by the defendant, and rejected by the Court; to which decision, Counsel for defendant then and there excepted.

Defendant then introduced JOHN W. POWELL and proposed to prove, that in the summer of '48 or '49, witness had a conversation with plaintiff, independent of and without authority from any person, either to settle, or to compromise, or make any treaty with regard to the property in dispute; in which conversation witness told the plaintiff that he (the

plaintiff) knew that the slaves bequeathed in Mrs. Elizabeth Goodwyn's will, was intended not to give him the property, but to secure it to Burwell Goodwyn and his children, and to prevent the property from being sold to satisfy the creditors of the said Burwell Goodwyn. The plaintiff admitted that it was true that the item in said will was made for the purposes aforesaid; whereupon, the plaintiff proposed, through witness, to compromise and settle said case, and at no time before. The plaintiff did not, in said conversation, at any time, say that his admission of statement to witness was confidential, or make any caution or reservation to this effect; which testimony said Court rejected, and to which ruling of the Court Counsel for defendant excepted.

After the parties had closed their testimony, the defendant having reduced the above testimony to writing, again offered the same on the part of the defendant, and appealed to the discretion of the Court to allow and permit the witness to testify in said cause, which motion was over-ruled by the Court, and defendant excepted.

THOMAS D. GOODWYN, sworn for defendant, and testified: That he had no interest, and had been acting as the agent of his mother, the defendant, and hired the negroes out every year as the agent of his mother; that a short time after the death of his father (Burwell Goodwyn) in 1835, a controversy took place between his mother, the defendant, and plaintiff, in relation to the ownership of this property. Plaintiff procured a copy of Elizabeth Goodwin's will, and would frequently find fault with defendant for whipping his negroes. Defendant would tell him the negroes were not his. Witness came from Virginia to Georgia with defendant and the negroes, and has no recollection of any such incident by the way as that testified to by Mr. Cross, in regard to the offer to purchase one of the negroes on the road. They came from Virginia to Georgia in February, 1843. Frequently in Virginia, and afterwards in Georgia, witness heard conversations between plaintiff and defendant, as he has stated. In 1843, November or December, plaintiff proposed to hire these

negroes to the defendant for fifty dollars, when defendant replied to him she would not hire her own negroes, and that the negroes were hers and not his.   Plaintiff then came down to five dollars, when the defendant made the same reply. Plaintiff came back from Tennessee, and in 1847, plaintiff and Braddock Goodwyn spoke of renting a place and farming together.   Witness asked him where he was going to get negroes to work his farm?   Plaintiff said he was going to take the negroes—that they were his; defendant told him he had no negroes there—that these negroes were hers. Plaintiff is witness' brother, and is now about 40 years of age; plaintiff was born in 1815 or '16; three years between witness and plaintiff; witness' father died 14th February, 1835.   Witness was present at the Sheriff's sale in Virginia when Winney was sold—Burwell Goodwyn also present; the negroes were bid off by a man named Oliver, a friend of Burwell Goodwyn's, whom he had sent for to attend the sale. Said negroes were sold on the plantation of Burwell Goodwyn, and were never at any time out of his possession, up to his death.   In 1843, plaintiff returned to Virginia, and did not return to Georgia until near Christmas, 1846.   Witness further stated, that in the several conversations referred to in the testimony of William Beadles, that he (Beadles) told him that the conversation with defendant took place in 1843. Witness thinks he said to Davis Owen, when he wished to buy one of the negroes, that the property was claimed by both the plaintiff and the defendant.

The defendant introduced Dr. C. H. SMITH, who testified, that William Beadles came to him and stated that he wished to see his wife; that he was uncertain at what time the conversation took place about the negroes with defendant, and that he thought she could refresh his recollection on that point.

B. GOODWYN heard the plaintiff offer to hire the negroes in dispute to defendant in 1843, who refused to hire them at fifty dollars and at five dollars; denied his right to them and claimed them as her own property.   In 1847, witness and plaintiff talked of renting a farm; defendant asked plaintiff

where he would get negroes to work his farm; he said he would take the negroes in dispute; defendant replied to him that they did not belong to him; that they were her property and he should not have them. Witness was present, in 1848, when plaintiff borrowed of defendant boy Ned, one of the negroes in dispute, to wait upon him at his grocery in Newnan; and afterwards, said boy was returned. Plaintiff proposed, in the presence of Paul Dominick, to give witness two negroes, if he would go right in the case. Plaintiff told witness that he would have abandoned the case long ago, if his lawyers would have permitted him to do so; that they had paid out money for him and would not let him do so.

HENRY GOODWYN heard plaintiff propose, in 1848, when about leaving for Virginia, to hire the negroes to defendant; defendant refused to hire them, denied his right to the property, and said they were her own property; and afterwards, frequently heard plaintiff claim the property, and defendant deny his right to it and claim it as her own; defendant has always managed and controlled these negroes as her own, ever since witness can recollect; he is a younger brother of plaintiff, about 23 years of age; also, that plaintiff had stated to him that he would have abandoned this suit if his lawyers would have permitted him; and that plaintiff further stated to him, that William Beadles was mistaken; that it was in 1843 when he addressed Miss Nancy Edmondson, now Mrs. Nancy Smith.

The defendant then introduced the tax books of Coweta County for 1848 and '49, from which it appears that plaintiff did not return these negroes as his property.

JOHN W. POWELL proved that in 1848 he had a conversation with plaintiff, in which plaintiff proposed to sell to witness his grocery, for which plaintiff had agreed to give one thousand dollars, and his claim on said negroes for fifteen hundred dollars; witness replied, that if plaintiff would make him a good title he would give it, to which plaintiff made no reply.

The defendant also introduced the testimony of Mrs. Nan-

cy Smith, who was examined by commission, and which was as follows : Witness answers that her maiden name was Nancy E. Edmondson; that Napoleon B. Goodwyn was in the habit of visiting her father's house the first years that he came to Georgia from Virginia; that he was there several times with his sister ; that was in 1843; that subsequently he visited the State of Tenn. and after his return to Georgia he visited her father's again, which she thinks was in the year 1846 or '47 —she thinks probably it was in 1847; she (witness) was not married until the year 1849 ; she states that Mr. William Beadles applied to her at one time to know what year she was addressed by Mr. Napoleon B. Goodwyn; that she answered him that he (Napoleon B. Goodwyn) had never addressed her at any time.

The defendant then closed, and plaintiff introduced DAVIS OWEN, who proved that Thomas D. Goodwyn stated to him, when he applied to buy the girl Caroline, that she belonged to the plaintiff, who was then near Nashville, Tenn.

The Court charged the Jury, that to entitle the plaintiff to recover, he must prove—1st. Title in himself, and a right to the possession at the time of the commencement of the action. 2d. Possession by the defendant. 3d. A conversion by the defendant, and what amounts to a conversion; and 4th. The value of the property.

That it was proper to inquire where the title to the property originally vested. If in Burwell Goodwyn, had it ever passed out of him, and how ? That a seizure and sale by the Sheriff, if legal, would vest in the purchaser all the title which the defendant had; that the law presumes a Sheriff's sale *bona fide*, in the absence of proof to the contrary; that continuance in possession by the defendant, though a badge or circumstance indicating fraud, might be explained, and the possession of a father for a minor child, living with him, might be a satisfactory explanation. If the title to the property remained in Burwell Goodwyn till his death, it still continues in his estate, unless it has been administered according to law; and neither the plaintiff nor the defendant

having any title, the plaintiff cannot recover.  But if Eliza-beth Goodwyn purchased the property at Sheriff's sale, al-though the sale was illegal or fraudulent, if Burwell Goodwyn, with a knowledge of his rights, acquiesced in that sale, and in any subsequent disposition of it by will or otherwise by Elizabeth Goodwyn, then he would be estopped from denying her right and the right of those who derived title from her ; that then, if Jury should believe that the title of this prop-erty vested in Elizabeth Goodwyn, the next inquiry is, has it ever passed out of her, and to whom, and by what means ? A bequest of the property by her last will and testament, would convey the title, subject, however, to the special title conferred by law on the executor, to enable him to control the estate for the purposes of distribution, payment of debts, &c.; that before a legatee could sue even for a special lega-cy, there must be an assent of the executor, either express or implied ; that assent might be inferred even from slight circumstances, particularly after a considerable lapse of time, such as the permission by the executor for the property to go in the possession of the legatees and remain there a con-siderable time, or into possession of any one else for the time, to be controlled for him or his benefit.  But there must be some evidence of assent, either expressed or implied, or that the plaintiff could not recover.  If title, then, ever vested in the plaintiff, it has continued in him, unless it has been di-vested by his own act or by operation of the law, or unless he is barred by the Statute of Limitations, and this it is in-cumbent on the plaintiff to show; that though Burwell Good-wyn may have been estopped by his acts and acquiescence as aforesaid, yet the defendant is not bound by his acts, un-less she claims under him—of which there is no evidence. His declarations while in possession of the property, and made against his own interest, may be evidence of ownership in Elizabeth Goodwyn, but the defendant may rebut that ev-idence and show that no title ever vested in her; that the defendant is, however, bound by her own acts, declarations and acquiescence in plaintiff's title.  It is then proper to in-

Goodwyn vs. Goodwyn.

quire how the defendant acquired possession of the property,. whether as her own or the property of the plaintiff. If she took possession of it as the property of the plaintiff to hold it for him, and recognized his right and ownership of it, then while this relation existed she could not avoid his right to recover it, whatever may have been the defects of his origi nal title; that the recital in the will, that a part of the ne-groes were subject to a trust deed, could not bar the plain-tiff's right to recover, unless it were shown that the condi-tions of that trust were inconsistent with the plaintiff's right to the possession of the property at the time of the com-mencement of the action ; that if the defendant held the pro-perty as the property of the plaintiff, the Statute of Limita-tions would never commence running in her favor so long as that relationship existed. But when she denied the plain-tiff's right and commenced holding adversely to him, and this fact is brought to his knowledge, so soon as he is notified that the defendant is holding adversely to him, he must sue within four years or his right of action is barred, unless, sub-sequently, she acknowledges his right to the property ; and in that case, her acknowledgment that she held the property as his, would take the case out of the operation of the statute until she repeated her adverse claim and that fact was brought to the notice of the plaintiff. If the defendant has acknowl-edged the plaintiff's right within four years preceding the commencement of the suit, his action is not barred; but if, on the other hand, she was in the continuous adverse posses-sion of the property for four years next preceding the com-mencement of the suit, then his claim is barred, and the law is imperative that he cannot recover. The Court also charged the Jury as to the credibility of witnesses—the nature of ad-missions—conflict of testimony—the measure of damages, and the form of their verdict.

The defendant's Counsel then requested the Court, in wri-ting, to charge as follows : 1st. That the Jury should be sat-isfied from the evidence, that the plaintiff had the title to the

property sued for, and a right of possession at the time of the conversion, to entitle him to recover, whether the defendant originally obtained possession by right or by wrong; which the Court charged, substituting the word *believed* for *satisfied.* 2d. That as the plaintiff claims title under the will of Elizabeth Goodwyn, it is necessary further that the Jury should be satisfied, from the evidence, that she owned the property at the time of the execution of said will, and had the right to bequeath the same; which the Court charged, substituting the word *believe* for *satisfied.* 3d. That as the plaintiff attempts to trace title into Mrs. Elizabeth Goodwyn by reason of a Sheriff's sale, it is necessary that the Jury should be *satisfied*, from the evidence, that she bid off the property at said sale and paid the purchase money; and more especially if the Jury should believe, from the evidence, that the property remained in the possession of Burwell Goodwyn, the father of plaintiff, which the Court charged as requested, substituting the word *believe* as before, and with the following *addendum*, to-wit: but these facts may be proven as well by circumstances as by positive proof, and that if the Jury believe, from the circumstances proven, including the conduct, admissions and acquiescence of Burwell Goodwyn while in possession of the property, or of defendant while in possession, they may so find. 4th. That if it has not been sufficiently proven, to the satisfaction of the Jury, that Mrs. Elizabeth Goodwyn bought the property at Sheriff's sale and paid for it, then the simple fact that Burwell Goodwyn was present at the time the will was written and made no objections, (if the Jury should believe this fact to have been proven,) is not sufficient in law to confer title on Elizabeth Goodwyn, or to divest title out of any other person; and that no subsequent declarations of Burwell Goodwyn or the defendant, or any one else, could alter or change, or in any manner affect the right of the parties acquired under the Sheriff's sale; which the Court declined to charge in the language required. 5th. That the Jury must be satisfied, from the evidence, to entitle the plaintiff to recover, that the title of the plaintiff to the property in dis-

Goodwyn *vs.* Goodwyn.

pute is clear, absolute and paramount to all other titles; and that if they should be of the opinion, from the evidence, that the title to said property is in the third person, *or that the title of the plaintiff is uncertain and doubtful,* the plaintiff will not be entitled to recover; which the Court charged, omitting the words in *italics,* and substituting the words, " *or that the plaintiff has not a legal title in himself,*" and substituting the word *believe* for *be satisfied.* 6th. That it is necessary, further, to entitle the plaintiff to recover, *for him to prove to the satisfaction of the Jury,* that the executor of the will has assented to the legacy; which the Court charged as requested, substituting for the words in *italics,* " *that the Jury should believe from the evidence,*" and adding, that the assent may be either expressed or implied, and inference from circumstances as heretofore stated. 7th. That if the Jury shall be of opinion, from the evidence, that the defendant has been in the continuous, adverse possession of the property, claiming it in opposition to the rights of said plaintiff for four years or upwards, before the commencement of the suit, then the plaintiff is barred, and his title, if he ever had any in said property, is defeated and gone; which the Court charged as requested, with the addition, " *unless within the time she has acknowledged the plaintiff's right to the property.*" 7th. Where a title is set up in a party, by virtue of sale, authorized by law, it is necessary to show, in order to divest the title of the original party and vest it in the purchaser, that the sale was legal and all the requirements of law have been complied with; which the Court charged as requested and added that these facts may be proven by circumstances, as heretofore charged.

To which said charge, as given by the Court, and refusal to charge as required by Counsel for defendant, and the several rulings and decisions of the Court, in admitting and rejecting the evidence as heretofore stated and specified, the Counsel for said defendant excepted.

OVERBY; FREEMAN & SIMS, for plaintiff in error.

McKINLEY, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] No authority has been produced to justify it, and we know of no practice to sanction the introduction of testimony not to impeach the veracity but the memory of the witness. It would be attended with great inconvenience, and hinder and delay the progress of business, by turning aside to form these collateral issues. Once open the door to this sort of investigation, and it would not be restricted to the memory, but would apply to any real or supposed deficiency in any other mental faculty.

By a cross-examination of the witness himself, as was done in this case, the Jury, whose province it is, will be enabled to decide, satisfactorily, as to the credit or weight rather to be attached to the testimony.

[2.] We are clear, that the Court was wrong in excluding the evidence of John W. Powell; he was a competent witness, and his testimony was material. And the party introducing him was not to be deprived of the benefit of it by a misunderstanding of the proof, on the part of the Court, that the admissions of the plaintiff were made to the witness under a negotiation for a compromise. The appeal to admit him when the mistake was discovered, was to the justice, and not to the discretion of the Court.

[3.] As to the acknowledgments made by the family, that the negroes in dispute belonged to Napoleon B. Goodwyn, and the claim set up by him to the property in the presence of the family and acquiesced in by them—the legality of this proof turns upon the fact of whether or not Mrs. Goodwyn was present. If so, they should have been received; if not, rejected.

[4.] As to the belief of the two witnesses, William H.

Goodwyn and Stephen P. Pool, it was improper, unless they stated the facts upon which that belief was founded.   They might have testified as to the best of their recollection, that the negroes were the same that formerly belonged to Burwell Goodwyn; that they were in his possession up to the time of his death, and subsequently in that of his widow, until she removed to Georgia.

[5.] The first error in the charge of the Court is, that the possession of Burwell Goodwyn might be explained by his holding the property for Napoleon, his minor son.

[6.] The negroes were sold in 1822.   The will of Mrs. Elizabeth Goodwyn, bequeathing this property to her grandson, Napoleon, was not made until the fall of 1830.   Of course his title did not accrue until after that time.   And yet, the negroes never changed possession, but were held by Burwell Goodwyn all this while.   The circumstance referred to by the Court, therefore, did not explain the character of Burwell Goodwyn's possession.

[7.] But the main error in the charge, and one which goes to the foundation of the case, was, in instructing the Jury that if Elizabeth Goodwyn purchased the property at Sheriff's sale, and Burwell Goodwyn acquiesced in that sale, and in the subsequent disposition of it by the will of Elizabeth Goodwyn, that then he would be estopped from denying her right, as well as the title of Napoleon, notwithstanding the sale was a sham.

[8.] Whether this be so or not, depends upon another very material fact, namely : Whose money paid for this property ? If Elizabeth Goodwyn's paid for it, then it was hers, and she was entitled to will it with or without the consent and acquiescence of Burwell.   If, on the other hand, his money paid for it, not having got possession of the negroes, she never could have recovered them from him during her lifetime; neither could she will them after her death so as to enable her legatee to do so, notwithstanding the acquiescence of Burwell in the will, unless detriment resulted therefrom.

[9.] Has any been proven ?   Is it shown or attempted to

be shown, that but for willing this property to Napoleon, his grand-mother would have given him other property? How is he damnified so as to entitle him to the application of the doctrine of estoppel? His creditors who might have trusted him upon the faith of this legacy, are not before the Court complaining. Indeed, he could have had none at that day, on account of his tender years. Has any advantage accrued to Burwell Goodwyn, either over Mrs. Elizabeth Goodwyn or Napoleon?

[9.] In the absence of all this, he is not estopped; and upon the hypothesis that his money paid for the property at Sheriff's sale, any act, declaration or agreement, on his part, is without consideration, and cannot be enforced. This arrangement, if fraudulent, can no more be enforced against him than its rescision could be at his instance, did the opposite party have possession. The law and the Courts will leave them all where it found them. And the maxim of *portior est* applies.

If A sells property to B to defeat C, and A pays for it, although under the Statute of *Elizabeth*, the transaction is void as to C; still, it is good as between A and B; and A can recover the possession. Not so, however, if A paid nothing. If B obtained possession, he could hold it as against A, and volunteers under him. But if he failed to get possession, he cannot ask the aid of a Court to compel the execution of the covinous contract.

Here, then, is the hinge upon which this case turns, to-wit: The *bona fides* or *mala fides* of the real or pretended Sheriff's sale, and the further inquiry of injury or no injury to Napoleon by the acts and acquiescence of his father in the sale and will.

[10.] We hold that the Court was authorized to charge as it did, respecting the Sheriff's sale. The parol or secondary evidence had been let in without objection; and the Jury, therefore, had a right to pass upon it. That the execution or judgment under which the sale was made, would have been higher proof, if insisted on, there can be no doubt. Failing

to procure this after due search, secondary proof would be admissible.

Although the Court might have been a little more guarded, perhaps, in stating the law, as to the Statute of Limitations, we think he charged it substantially as laid down by this Court, when this case was up before.